A05A1400. MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA et al. v. GOLD-ARROW FARMS, INC. et al.
A05A1401. GEORGIA POWER COMPANY v. GOLD-ARROW FARMS, INC. et al.
A05A1402. INTERSTATE FIBERNET, INC. v. GOLD-ARROW FARMS, INC. et al.

(625 SE2d 57)

ANDREWS, Presiding Judge.

These appeals concern whether express easements originally granted to Georgia Power Company (GPC) to construct and operate "electric transmission, distribution and communication lines" not only permit the electric transmission and distribution lines constructed across the easements, but also permit a fiber optic communication line constructed across the easements and used for the purpose of general telecommunications. The owners of land traversed by the easements, Gold-Arrow Farms, Inc., Sugar Plum Properties Associates, Ltd., A. E. Hester, and Jerry L. Jones (the plaintiffs), filed an action against GPC, Municipal Electric Authority of Georgia (MEAG), Georgia Public Web, Inc. (GPW), and Interstate Fibernet, Inc. (IFN) (the defendants). GPC and MEAG are the electric power companies which currently own the easements. IFN contracted with GPC to construct, operate, and share a fiber optic communication line across the GPC-owned easements, and GPW contracted with MEAG to lease a fiber optic communication line constructed by MEAG across the easements currently owned by MEAG. Under the contracts, IFN and GPW offered telecommunications services by selling, leasing, or licensing communication capacity in the fiber optic line to third-party telecommunication companies for the purpose of transmitting general telecommunications. The plaintiffs concede that the easements permit the fiber optic line to the extent it is used for the purpose of transmitting internal communications by GPC and MEAG necessary for operation of their electric transmission and distribution lines. But the plaintiffs allege that the defendants exceeded the scope of the easements when communication capacity in the fiber optic line in excess of that used internally by GPC and MEAG was either used, or was sold, leased or licensed to telecommunication companies, for the purpose of general telecommunications. In addition to seeking class action certification to represent similarly situated landowners, the plaintiffs seek the award of actual and punitive damages based on claims for trespass on the easements, breach of the easement agreements, malicious interference with the easements, unjust enrichment, estoppel, and breach of the duty of good faith and fair dealing. The plaintiffs also seek injunctive and declaratory relief.

The plaintiffs moved for partial summary judgment on the declaratory relief sought in count six of their amended complaint in

which they asked the trial court to declare that the easements limit use of the fiber optic line to internal communications by GPC and MEAG related to their transmission and distribution of electricity, and that use of the line for general telecommunications, or the sale, lease or license of the line to others for general telecommunications, exceeds the scope of the easements. The defendants responded and filed cross-motions for summary judgment on all of the plaintiffs' claims contending that use of, or sale, lease or license of the fiber optic line for the purpose of general telecommunications is within the scope of the easements. The trial court granted the plaintiffs' motion for partial summary judgment and denied the defendants' cross-motions for summary judgment. In the three appeals consolidated for this opinion, all the defendants (MEAG and GPW in Case No. A05A1400, GPC in Case No. A05A1401, and IFN in Case No. A05A1402) claim that the trial court erred by granting partial summary judgment to the plaintiffs and by denying their cross-motions for summary judgment.

GPC originally acquired the eight easements at issue by express grant from the plaintiffs or their predecessors in title. The easements were conveyed by virtually identical form instruments dating from 1953 to 1981, which granted GPC and its successors and assigns easements to construct and operate "electric transmission, distribution and communication lines. . . ." Pursuant to the rights granted in the easements, GPC and MEAG (which currently owns three of the easements) constructed and operate electric transmission and distribution lines suspended overhead on a system of towers, poles, lines, and other structures spanning across the easements. The fiber optic communication line was subsequently placed across the easements by GPC, IFN, and MEAG in the mid to late 1990s. To accomplish this, the fiber optic line was placed inside the existing static wire which was part of and ran across the top of the electric transmission and distribution system. The line consists of a bundle of hair-thin optical glass fibers, each fiber having the capacity to communicate large amounts of information by transmitting audio, video, or data signals along the length of the fiber in the form of light pulses. Because of the large communication capacity in the fiber optic line, it serves a dual communication purpose: a small part of the communication capacity in the line provides GPC and MEAG with internal communications necessary for the operation of their electric transmission and distribution systems, and the remaining communication capacity in excess of that used internally by GPC and MEAG is sold, leased or licensed under the agreements with IFN and GPW for the purpose of general telecommunications.

The parties and the trial court agreed, and we concur, that the language in the easements granting the right to construct "electric

transmission, distribution and communication lines . . ." grants the right to construct electric transmission lines, electric distribution lines, and electric communication lines. Accordingly, the meaning of the grant to construct "electric communication lines" across the easements was the central issue before the trial court on summary judgment. In moving for partial summary judgment, the plaintiffs argued that, in a definitional sense, a fiber optic communication line cannot be an electric communication line because a fiber optic line uses glass fibers to transmit light pulses and the glass does not conduct electricity. Nevertheless, the plaintiffs argued that, in another sense, a fiber optic communication line qualifies as an electric communication line under the easement if it is used only for internal communications by GPC and MEAG related to their operation of the electric transmission and distribution system. Based on these arguments, the plaintiffs contended that, to the extent the fiber optic communication line is used for purposes of general telecommunications unrelated to the electric system, it is not an electric communication line and it exceeds the scope of the easements. The plaintiffs argued that the language of the easements unambiguously supports their contentions, but if the trial court found the easements were ambiguous, that the court should resolve the ambiguity in their favor by considering matters outside the easements showing that, when the easements were granted to GPC, there was no intent to grant a general telecommunication easement because GPC was in the electric power business, not the general telecommunication business.

In opposition to these arguments, the defendants contended that, by granting the right to construct electric communication lines, the easements unambiguously granted, without limitation, the right to construct lines over which communications are transmitted by electricity, for example, a telephone line. The defendants further contended that, because the easements were unambiguous, matters outside the easements could not be used to explain their meaning. The defendants argued that the fiber optic communication line was an advance in communication technology over an electric communication line with no change in the physical use of the easements or additional burden on the servient estates. Accordingly, the defendants contended that, whether used for general telecommunications or for internal communications, use of the fiber optic communication line instead of an electric communication line is merely a change in the manner or degree of the granted use to accommodate a new technology and is within the scope of the easements. Finally, the defendants contended that, as exclusive easements in gross, the easements were divisible, and that the sale, lease, or license of

communication capacity in the fiber optic line to third-party telecommunication companies was done within the scope of the easements and without imposing any unreasonable burden on the servient estates.

The trial court agreed with the defendants to the extent it found that a fiber optic communication line was the technologically advanced equivalent of an electric communication line within the meaning of the easements. However, after finding that the easements permitted the construction of a fiber optic communication line in the place of an electric communication line, the trial court considered whether the easements permitted use of the line for general telecommunications and concluded that "the meaning of the easements on this point cannot be determined merely from the unambiguous language of the easements." The trial court examined all the language contained in the virtually identical form instruments granting the easements and found that "[t]he easements have no language limiting the purpose or subject matter of the communications or defining 'communications.' " Nevertheless, the trial court found that each easement had a title naming a transmission line over which the easement was to pass and that the title did not mention communications. The court also noted that there were other references in the easements to "transmission lines" or to "said line or lines." Based on this analysis, the trial court found that the easements had a "very explicit electric supply purpose," and that there was a lack of language in the easements "suggesting that they provide a freestanding public telecommunications purpose." The trial court concluded that

> the only plausible interpretation of the explicit reference in the easement to "electric transmission, distribution and communication lines" is "transmission, distribution, and communication lines for the electric industry." This Court, therefore, finds that these easements by their own terms clearly and unambiguously limit easement uses to electric industry uses.

The trial court continued its analysis by proceeding to examine matters outside the language of the easements to find "the intent of the parties" based on "the attendant circumstances existing at the time each easement was created." Examination of these matters led the trial court to further conclude that

> [b]ased upon the corporate purposes set forth in the Georgia Power Company Charter and applicable corporate resolutions at the time of creation of the easements, this Court concludes that Georgia Power did not manifest an intent at

the time the easements were created to acquire a general communications use.

Based on these conclusions, the trial court agreed with the plaintiffs that the easements permitted construction of the fiber optic communication line for the purpose of internal communications by GPC and MEAG directly related to the electric transmission and distribution system, but it exceeded the scope of the easements to use the line for the purpose of general telecommunications. Accordingly, the trial court granted the plaintiffs' motion for partial summary judgment on the declaratory relief sought under count six of the amended complaint.

1. We agree with the defendants that the trial court erroneously construed the language of the easements and erred by granting partial summary judgment in favor of the plaintiffs.

Construing the language in the express easements at issue is governed by the rules of contract construction. *Irvin v. Laxmi, Inc.,* 266 Ga. 204, 205 (467 SE2d 510) (1996). Generally, this presents a question of law for the court, unless the language presents an ambiguity that cannot be resolved by the rules of construction. *Hardman v. Dahlonega-Lumpkin County Chamber of Commerce,* 238 Ga. 551, 553 (233 SE2d 753) (1977); *Imerys Marble Co. v. J. M. Huber Corp.,* 276 Ga. 401, 403 (577 SE2d 555) (2003). The cardinal rule of construction is to ascertain the intent of the parties. *Irvin,* 266 Ga. at 205. "Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." *Southern Fed. Sav. & Loan Assn. &c. v. Lyle,* 249 Ga. 284, 287 (290 SE2d 455) (1982); *Park 'N Go of Ga. v. U. S. Fidelity &c. Co.,* 266 Ga. 787, 791 (471 SE2d 500) (1996). To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred. *Cole v. Thrasher,* 246 Ga. 683, 684 (272 SE2d 696) (1980); *McCann v. Glynn Lumber Co.,* 199 Ga. 669, 674 (34 SE2d 839) (1945). "[W]hen the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation . . . the language used must be afforded its literal meaning and plain ordinary words given their usual significance. . . ." *Wolverine Ins. Co. v. Jack Jordan, Inc.,* 213 Ga. 299, 302 (99 SE2d 95) (1957). " 'Words generally bear their usual and common signification; but technical words, or words of art, or [words] used in a particular trade or business, will be construed, generally, to be used in reference to this peculiar meaning . . .' [OCGA § 13-2-2 (2)]." *Pace Constr. Corp. v. Houdaille-Duval-Wright Div. &c.,* 247 Ga. 367, 368 (276 SE2d 568) (1981). An "[a]mbiguity is defined as duplicity, indistinctness, an uncertainty of meaning or expression used in a

written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations." (Citation and punctuation omitted.) *Early v. Kent,* 215 Ga. 49, 50 (108 SE2d 708) (1959). "Where . . . ambiguities exist, [the court] may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent." *Lyle,* 249 Ga. at 287. "Parol evidence may not be considered unless the written instrument is ambiguous." *Irvin,* 266 Ga. at 205.

Applying these principles to construction of the easements at issue, we find that the terms of the express easements clearly and unambiguously granted easements for electric communication lines without any limit prohibiting use for general telecommunications. All of the easements were conveyed to GPC by form instruments using virtually identical language. The easements grant GPC and its assigns the right to construct "electric transmission, distribution and communication lines" across the subject land. There is no dispute that this language granted the right to construct electric transmission lines, electric distribution lines, and electric communication lines. As the trial court correctly found, there is nothing in the easements which defines electric communication lines or limits the purpose for which the lines can be used. The fact that GPC was also granted easements for electric transmission and distribution lines does not limit the easement granted for electric communication lines. Although the trial court found there was a lack of language in the easements specifically stating that the easements for electric communication lines could be used for general telecommunications, the lack of such language does not prohibit a general telecommunications use, nor does it create an ambiguity as to whether that use was permitted. To the contrary, the easements for electric communication lines were granted without express limitation. As the trial court found in its order, citing to 18 Encyclopedia Britannica at 66 (15th ed. 1974), the usual and common meaning of "electric communications" has been defined as "the instantaneous transfer, by electrical means, of intelligence over distance." When the easements at issue were granted to GPC dating from 1953 to 1981, the usual and common meaning of the words "electric communication lines" included general telecommunication uses such as telephone or telegraph lines, which communicate information over lines by electrical means.[1]

---

[1] For example, in *Goldberg v. Sweet,* 488 U. S. 252, 254 (109 SC 582, 102 LE2d 607) (1989), a case dealing with telecommunications issues in interstate commerce, the court noted that traditional communication technology, where "telephone calls were relayed through electric wires," was giving way to advanced fiber optic and other technologies. See also "Telegraph" defined as: "A communication system that transmits and receives simple unmodulated electric

There is no evidence that the words "electric communication lines" were technical words, words of art, or words with a particular trade or business meaning that were understood to exclude general telecommunications or were limited to electric industry uses. See OCGA § 13-2-2 (2). Moreover, nothing prevented GPC or MEAG from acquiring the easements for electric communication lines by express grant, and then contracting to allow IFN and GPW to sell, lease, or license telecommunications capacity.

The trial court also found that other terms in the easements showed that they excluded a general telecommunications use. Each easement is generally titled "Easement For Right-Of-Way," followed one line down by a name referring to the location of a transmission line. For example, directly under the general title, one of the easements refers by name to "Thomasville-Florida State Line Transmission Lines." The fact that the easements are referenced by a transmission line name and grant easements for electric transmission lines and electric distribution lines provides no basis for concluding that the easement granted for electric communication lines was limited to uses related to the transmission and distribution lines. Each easement also contains several paragraphs appearing after the description of the servient estate and prior to the habendum clause. Those paragraphs variously provide: (1) that GPC agrees to pay for damages to crops, fruit trees, or fences caused by construction or maintenance of "said transmission lines," except those likely to endanger or interfere with "said lines," and that crops and fruit trees damaged in the construction or maintenance of "said transmission lines" shall remain the property of the owner, (2) that GPC will pay for timber cut in the initial clearing and construction of "said transmission lines," and (3) that the grantor reserves the right to use the land upon which "said transmission lines" may be erected for agriculture or other purposes not inconsistent with the rights granted, provided the use shall not interfere with the operation of "said line or lines." Again, whether the references in these paragraphs to "said transmission lines" or to "said line or lines" was intended as a shorthand reference to all the easements granted, or referred only to the electric transmission easement, nothing in these paragraphs limits or is inconsistent with the plain language granting an easement for electric communication lines.

The plain and unambiguous language used by the parties granted easements for electric communication lines without placing any limitation that would prohibit use for general telecommunications.

---

impulses, especially one in which the transmission and reception stations are directly connected by wires." American Heritage Dictionary (3rd ed. 1992).

The only reasonable interpretation that can be given is that "electric communication lines" means what it literally says — an easement for communication lines that use electricity to transmit communications over the lines. *Wolverine Ins. Co.*, 213 Ga. at 302. Nothing in the language of the easements supports the trial court's conclusion that the easements unambiguously limit electric communication lines to "electric industry uses." Because the language of the easements was unambiguous, the easements were the only evidence that could be considered in ascertaining the intent of the parties. *Lyle*, 249 Ga. at 287; *Park 'N Go*, 266 Ga. at 791. It follows that the trial court also erred by considering matters outside the easements to find that the parties intended to exclude a general telecommunication use.

2. The easements permitting the construction of electric communication lines also permitted construction of the fiber optic communication line.

The trial court agreed in principle that the easements for electric communication lines permitted use of fiber optic communication lines as an accommodation for new technology. Nevertheless, the trial court held that no such accommodation was permitted for general telecommunications use because using the fiber optic line for general telecommunications exceeded the scope of the easements. As we held in Division 1, supra, the trial court erred by construing the easements to prohibit use for general telecommunications. It follows that placing the fiber optic communication line on the easements instead of an electric communication line was an accommodation to technology within the scope of the easement.

Generally, "the manner, frequency, and intensity of use of the servient estate may change to take advantage of developments in technology . . ." as long as the change does not "cause unreasonable damage to the servient estate or unreasonably interfere with its enjoyment." Restatement (Third) of Property: Servitudes § 4.10 cmt. f; see *Corley v. Entergy Corp.*, 246 FSupp.2d 565, 578 (E.D. Tex. 2003) ("The use of a fiber optic line is simply a technologically advanced means of accomplishing the communicative purpose of transmitting voice and data."). The rule recognizes that uses reasonably necessary for enjoyment of an easement may change over time with technology and promotes productive use of the land. Restatement (Third) of Property: Servitudes § 4.10 cmts. b, c, and f. Because this kind of change in the use of an easement amounts to change in the degree of use rather than in the kind of use, it remains within the scope of and does not violate the existing easement. See *Faulkner v. Ga. Power Co.*, 243 Ga. 649, 650 (256 SE2d 339) (1979); *Kerlin v. Southern Bell Tel. &c. Co.*, 191 Ga. 663, 667-670 (13 SE2d 790) (1941).

3. The defendants contend that the trial court should have ruled in favor of their claims that the easements were divisible.

In their amended complaint, the plaintiffs not only contended that use of the fiber optic line for general communications exceeded the scope of the easements, but also contended that, when the defendants sold, leased, or licensed the line to various third-party telecommunication companies for the purpose of general telecommunications, this resulted in transfer and division of nonexclusive easements in a manner that unreasonably burdened the servient estates and exceeded the scope of the easements. See Restatement (Third) of Property: Servitudes § 5.9. In ruling on the plaintiffs' motion for partial summary judgment and the defendants' motions for summary judgment, the trial court found the easements did not permit a general telecommunications use. Accordingly, the court ruled that the defendants could not divide what they did not possess, and that it was not necessary to address the plaintiffs' additional contentions. The defendants contend that the trial court should have ruled in favor of the arguments in their motions that the easements at issue were exclusive easements in gross that were properly transferred and divided, and therefore the court should have granted their motions for summary judgment.

Because we ruled in Division 1, supra, that the trial court erred by finding that the easements excluded use for general telecommunications, we agree that the court should have addressed these additional issues. But "[t]his court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it." (Punctuation and footnote omitted.) *Carver v. Empire Fire & Marine Ins. Co.*, 270 Ga. App. 100, 105 (605 SE2d 842) (2004). Accordingly, the case is remanded for the trial court to address these issues in a manner consistent with this opinion.

4. In addition to the arguments for summary judgment advanced by all the defendants, GPC sought summary judgment on the basis that: (1) it only used the easements for electric industry purposes, a use the plaintiffs concede was authorized, and (2) even if the plaintiffs' erroneous claim that the easements excluded a general telecommunications use is accepted, GPC did nothing more than enter into a contract with IFN authorizing IFN to use, lease, or license the easements for general telecommunications. GPC claims the trial court erred by denying its motion for summary judgment on these grounds.

In support of these grounds, GPC relies on *Tompkins v. Atlantic Coast Line R. Co.*, 89 Ga. App. 171 (79 SE2d 41) (1953) and *Davis v. Williams Communications, Inc.*, 258 FSupp.2d 1348 (N.D. Ga. 2003) (citing *Tompkins*). In *Tompkins* and *Davis*, railroad companies which held easements for tracks across the plaintiffs' land entered into

agreements to allow utility companies to place lines on the easements. The plaintiffs claimed that the utility lines were not authorized under the railroad easements, and sought compensation from the railroad companies for the encroachment. In both cases, the court held that the utility companies could have acquired the right to place their lines on the railroad easement by condemnation, and the fact they accomplished by contract with the railroad companies what they could have forced by condemnation entitled the railroads to dismissal of the claims for compensation. *Tompkins*, 89 Ga. App. at 177-178; *Davis*, 258 FSupp.2d at 1350-1353. GPC argues that its contract with IFN authorizing placement of the fiber optic communication line was, likewise, forced by threat of condemnation, so it cannot be held liable.

We find no merit in GPC's argument. The contract between GPC and IFN was originally between IFN's predecessor, MPX Systems, Inc., and the Southern Development & Investment Group, Inc., acting on behalf of various wholly-owned subsidiaries of The Southern Company, including GPC. The contract was a complex agreement governing joint use, operation and maintenance of a fiber optic communication system over a wide area, which allowed placement of the fiber optic communication line at issue on the GPC electric transmission and distribution system of towers, poles and lines, and allowed GPC to enjoy the benefits of a low-cost internal fiber optic communication system. Even if IFN's predecessor, MPX, had condemnation power to place the fiber optic communication line on GPC's easement right-of-way,[2] it is clear that the contract between IFN and GPC was not simply an agreement to allow right-of-way use which was directly forced by the power of condemnation. It was a contract in which the parties negotiated mutually beneficial terms for operation of a shared fiber optic communication system, which included the right to use GPC structures on the easements at issue that could not have been obtained by condemnation. Under these circumstances, we find no basis for concluding that, when GPC contracted for placement of the fiber optic communication line on the easements, it did by contract what it would otherwise have been forced to do by condemnation. Accordingly, *Tompkins*, supra, and *Davis*, supra, are

---

[2] In *Tompkins*, supra, and *Davis*, supra, the power to condemn the railroad right-of-way for placement of the utility lines existed under OCGA § 46-5-1 (a), which specifically gives any telegraph or telephone company the right of condemnation to construct and operate its lines "on, along, and upon the right of way and structures of any railroads. . . ." This section gives no specific right to condemn power company rights-of-way or structures, but it does allow condemnation "where necessary, under or over any private lands. . . ." Assuming the section applies to the present case, and assuming the "private lands" provision could include the GPC easement rights-of-way at issue, it plainly does not include condemnation of structures such as power company towers, poles, and lines.

distinguishable, and the trial court did not err by denying GPC's motion for summary judgment on these grounds.

*Judgment affirmed in part, reversed in part and remanded in part. Phipps and Adams, JJ., concur.*

DECIDED NOVEMBER 29, 2005 —
RECONSIDERATION DENIED DECEMBER 14, 2005 — ▮▮▮▮▮▮

*Alston & Bird, Peter M. Degnan, David M. Meezan, King & Spalding, Nolan C. Leake, John S. Darden, Troutman Sanders, Daniel S. Reinhardt, Scott A. Farrow, Michael E. Johnson, Thomas E. Reilly, Floyd & Lambert, George C. Floyd, McNatt & Greene, Hugh B. McNatt, Friend, Hudak & Harris, William D. Friend, Charles A. Hudak, Bouhan, Williams & Levy, Roy E. Paul, Leamon R. Holliday III*, for appellants.

*Kirbo & Kendrick, Bruce W. Kirbo, Bruce W. Kirbo, Jr., David A. Kendrick*, for appellees.

*Minor, Bell & Neal, Charles J. Bethel, Mark M. Middleton*, amici curiae.