**FIRST DIVISION**
**PHIPPS, C.J.**
**BARNES, P. J. and ELLINGTON, P.J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

July 12, 2013

# In the Court of Appeals of Georgia

A13A0782. HERREN et al. v. MITCHELL ELECTRIC MEMBERSHIP CORPORATION et al.

BARNES, Presiding Judge.

An electric service provider hired a tree service to clear some of its easements using herbicide, and the tree service applied the herbicide to an overgrown hedge planted directly under the electric company's power lines, killing most of the bushes. The owners of the property on which the hedge was located sued the electric company and the tree services for damages and injunctive relief. The trial court denied the injunction and granted summary judgment to both defendants. The property owners appeal, and we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in

the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

So construed, the evidence shows that appellants Vince H. Herren and John R. Stewart own and operate a mobile home park in Dougherty County. In 1938, the predecessor to Mitchell Electric Membership Corporation ("the electric company") entered into a one-page easement agreement with the property owners' predecessor in title. The agreement provides that the property owners granted to the electric company the right to enter their land

> and to place, construct, operate, repair, maintain, relocate and replace thereon and in or upon all streets, roads or highways abutting said lands, an electric transmission or distribution line or system, including the right to cut and trim trees to the extent necessary to keep them clear of said electric line or system and to cut down from time to time all dead, weak, leaning or dangerous trees that are tall enough to strike the wires in falling.

The electric company placed two electrical transmission lines across the property, one at the western boundary and one at the eastern boundary. The western electrical line is 1200 feet long and located approximately 10 feet inside the property line. The line is composed of seven wires. The top wire carries 14,400 volts, and under that is a "neutral wire," two "hook and wire secondary lines," two uninsulated

2

120-volt wires, and two communication lines. The bottom lines are roughly 20 feet off the ground. Wires split from the 120-volt wires and run down the pole, then run underground to supply electricity to each mobile home. A similar transmission line is located on the property's eastern boundary.

The power company employs an "integrated vegetative management plan" to keep its 4,500 miles of power line rights of way clear so crews can safely and efficiently maintain and repair the poles and lines. Repair crews need access to the poles and lines to effect repairs at any time under all weather conditions. Maintenance crews operate on a regular schedule to clear the rights of way using a variety of tools, including bucket trucks with hydraulic pole saws, hand saws, mower, and herbicides. The power company's forestry coordinator testified that time and money constraints did not allow the company to hand-prune much of the right of way, and herbicides were a cost-effective way to permanently solve certain potential problems.

The property owners bought the mobile home park in 1999. They experienced problems with trespassers, so first they installed razor wire along a fence on the property's western boundary. The problems continued, so after consulting a landscaper the property owners planted hedges of elaeagnus bushes along the eastern and western edges of the property in 2005. The owners understood that the elaeagnus

bushes would "intertwine . . . and create a barrier which would be virtually impenetrable by persons that wanted to come into the property." The eastern hedge was planted several feet from the middle of the power line easement, but the western hedge was planted directly below the lines and ran the entire length of the easement.. To further deter people from coming into the park on the western boundary, the property owners dug a two- to three-foot ditch parallel to and between the razor wire fence and the middle of the power line.

Over the years, the bushes on both sides of the property grew together and formed formidable hedges. The property owners maintained the eastern hedge at six or seven feet but did not prune the western hedge, which grew tall and wide. It eventually grew over the ditch to reach the razor wire and in some places grew as high as 26 feet The bushes grew up and around the poles and into volunteer trees that had sprouted within the hedge, past the communication wires and very close to the live wires. The hedge was so thick that workers could not see through it.

The western hedge made it more difficult to maintain the power lines, affecting the workers' ability to communicate with each other, to move about under the power lines, and to see what they were doing, especially at night and during storms when the lines went down. Additionally, while the eastern hedge was adjacent to a road from

4

which electric company trucks could access the poles and line, no similar access was available along the western line, which was blocked on one side by the razor wire and ditch and in places on the other side by the location of the mobile homes.

A construction foreman for the power company testified that even if the hedge were trimmed to six or seven feet high, workers would still have to either climb into the middle of the bushes, drive over the hedge with a truck, destroy parts of the hedge to maintain underground wires, and dig out the plant from around poles where work needed to be performed. He had been called on to repair the power lines over this easement and had to wade through the bush at night in a storm and stand in the ditch to raise his stick 35 feet in the air, bring down a blown fuse, change it, run it back up to the line, and close the fuse. He testified that a trimmed hedge is no easier for a person to penetrate than an untrimmed one. Further, if a power line broke, workers would have to clear any obstructions from the pole closest to the break, cut the wire, "sleeve it together where it broke," and then pull the line back up onto the pole, which was more difficult with a thick hedge below the line. Finally, the only way trucks could access certain points of the line within this easement was along the easement itself, but the bushes blocked that access also.

The growth of the elaeagnus hedge also increased the danger associated with power lines. The bush grows quickly and requires repeated pruning to maintain a reasonable height. It can grow more than 30 feet if it has something to anchor itself on. Vegetation that grows to contact a power line can cause power outages and possibly energize the vegetation itself, creating a danger to people and animals. The power company's forestry coordinator testified that an elaeagnus bush at another location had wrapped itself around a live wire and burned down the lines. He testified that this particular hedge was unmanaged, heading toward the power lines, and was going to create problems if it was not removed. It was killed with herbicide because it could not be removed with equipment, given the proximity of the mobile home and the danger of mowers or bush hogs slinging material sideways.

The power company hired co-defendant Townsend Tree Service Company, LLC in February 2010 to apply herbicide along some of the company's easements, including those located on the mobile home property. In October 2010, pursuant to this contract, the tree service applied herbicide to the western elaeagnus hedge and killed most of it. While the contract between the tree service and the power company provided that the tree service should notify landowners before beginning this work, the tree service failed to do so in this case.

The property owners filed suit and sought injunctive relief. Following a hearing, the trial court denied the request for an interlocutory injunction and held that the power company's easement was clear and unambiguous and gave it the right to destroy the western elaeagnus hedge. The trial court also held that the use of herbicide was not beyond the scope of the rights granted to the power company in the easement. The power company and tree service moved for summary judgment, and the trial court granted it to them, reiterating its conclusion that the power company was acting within its rights by destroying the hedge.

1. The property owners contend the trial court erred because the easement did not give the power company the right to clear-cut the property, "either chemically or mechanically." Easements are contracts, and are construed in accordance with the rules of contract construction. *Municipal Elec. Auth. of Ga. Gold-Arrow Farms*, 276 Ga. App. 862, 866 (1) (625 SE2d 57) (2005). If the terms of the easement are clear and unambiguous, the court looks to the easement itself to determine the parties' intent. (Citation omitted.) *Richardson v. Ga. Power Co.*, 308 Ga. App. 341, 343 (1) (708 SE2d 10) (2011). Intent is generally a question of law for the court to decide, unless the language presents an ambiguity that cannot be resolved by the rules of construction. Id.

(a) The easement begins by granting the power company "the right to enter upon" the property owners' land "to place, construct, operate, repair, maintain, relocate and replace thereon . . . an electric transmission or distribution line or system. . . ." This language plainly grants the power company the right to take any action required to install, operate and maintain the power lines. The easement then specifies that the authority to perform these tasks includes

> the right to cut and trim trees to the extent necessary to keep them clear of said electric line or system and to cut down from time to time all dead, weak, leaning or dangerous trees that are tall enough to strike the wires in falling.

The property owners argue that the easement does include the right to take out hedges or other undergrowth, only trees, and does not allow the electric company to use herbicide to control unwanted vegetation. They also argue that destruction of the hedge was not "absolutely necessary" to maintain the transmission line, as evidenced by a power company employee's testimony that he was able to repair a blown fuse despite the impediments caused by the hedge. Also, the tree service did not destroy the elaeagnus hedge on the eastern side of the property, but only cut out volunteer trees on which the bushes had climbed too high. Thus, the owners argue, the power

8

company could have simply trimmed the western hedge to a height of six or seven feet instead of killing it.

The issue is not, however, whether the power company had alternatives other than the one it took or whether it could possibly have accommodated the property owners' desire to have an impenetrable hedge to keep out intruders. The issue is whether the power company had the right under the easement to take the action it took. The answer is yes, because the hedge interfered with the power company's full use of the easement.

"One who grants an easement across his land retains to himself all possessory rights unabridged except to the extent requisite to the fair enjoyment of the easement." 1 Pindar's Ga. Real Estate Law & Procedure § 8-25 (6th ed. 2004). Thus, "[t]he grant of an easement impliedly includes the authority to do those things which are reasonably necessary for the enjoyment of the things granted." (Citation omitted.) *Jakobsen v. Colonial Pipeline Co.*, 260 Ga. 565, 566 (2) (397 SE2d 435) (1990); *Parris Properties, LLC v. Nichols*, 305 Ga. App. 734, 742-743 (1) (d) (700 SE2d 848) (2010). While the property owner retains title to the property over which the easement lies, the owner's right to use the property "must not in any way interfere with the full

9

and free use of the easement by [the grantee]." *Ga. Power Co. v. Sullivan*, 217 Ga. 699, 702 (2) (124 SE2d 634) (1962).

The easement in this case gave the power company the right to clear away obstruction that hindered its ability to operate, repair, and maintain the electric lines on the easement. The evidence establishes that the power company's destruction of the western elaeagnus hedge was reasonably necessary to accomplish these ends. Even if the power company could have maintained the hedge at a lower height instead of killing it, undisputed evidence showed that even a hedge of lower height would make maintenance of the line more difficult and dangerous and increase the risk of power outages. *Givins v. Ga. Power Co.*, 240 Ga. 465 (241 SE2d 221) (1978) (junkyard operating beneath power lines interfered with power company's right of access and repair).

(b) The property owners also argue that easement limits the power company's authority to trimming the hedge as opposed to destroying it. We disagree. The second clause of the easement specifies that the power company's authority "includes" the right to cut and trim live trees to keep them clear of the line and to cut dead or otherwise compromised trees that could strike the wires if they fell.

The Supreme Court of Georgia has explained that the meaning of the word "includes" or "including" depends on the context in which the words are used. *Berryhill v. Ga. Community Support and Solutions*, 281 Ga. 439, 441 (638 SE2d 278) (2006). Here, context establishes that the word "including" was used as a word of expansion, not of limitation. The easement first grants the power company the broad authority to enter onto the land and install, operate, and maintain the electric lines, which includes the authority to do what is reasonably necessary to achieve those results. That authority is not limited by any specific language in the easement. The second clause pertains only to trees and, more importantly, enlarges the power company's authority to cut trees that were not located within the easement itself if they posed a danger.

In sum, the easement grants to the power company the authority to install, operate, and maintain the electric lines, the authority to do what is reasonably necessary within the easement area to achieve those results, and the authority to trim and cut trees that may be located outside the easement. We therefore conclude that the clause regarding trees does not limit the power company's authority to clearing only trees from the right of way and not any other form of vegetation.

11

(c) Because the power company's authority to maintain its easement included the authority to clear the easement of any kind of vegetation and does not limit the manner in which the power company may do so, we also conclude that clearing the right of way with an herbicide did not exceed the scope of the easement.

2. The property owners also contend we should reverse because the tree service failed to notify the property owners in advance of the plan to use herbicide on the hedge as required by its contract with the power company.[1] We disagree. First, under the easement the power company had the authority to destroy the hedge regardless of the technique it employed and was not required to notify the property owners in advance. Because the tree service was acting pursuant to the power company's authority under the easement, it did not breach any duty to the property owners.

Second, the property owners were not parties to the contract between the power company and the tree service, and they did not allege in their complaint or raise in any pleading that they are entitled to damages for breach of contract as third-party

---

[1] Paragraph eight of the agreement provides that "[the tree service] shall not engage in herbicide spraying without first giving notice to the owners of such trees or brush... [and] to make every reasonable effort to obtain the consent of such owner to perform the required work." The property owners, however, were not parties to this agreement. And the same paragraph of the agreement goes on to provide that, ultimately, if the tree service could not obtain the owner's consent, the power company could "take such action as it deems appropriate."

beneficiaries to that agreement. See generally *Miree v. U. S.*, 242 Ga. 126, 135 (3) (249 SE2d 573) (1978) ("[F]or a third party to have standing to enforce a contract . . . it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit from performance of the agreement is not alone sufficient.") (citations omitted). " It is well settled that issues presented for the first time on appeal furnish nothing for us to review, for this is a court for correction of errors of law committed by the trial court where proper exception is taken." (Citation and punctuation omitted.) *Calhoun, GA NG, LLC v. Century Bank of Ga.* 320 Ga. App. 472, 477 (2) (740 SE2d 210) (2013).

For all the above reasons, we hold that the trial court did not err by denying the property owners' request for injunctive relief and by granting summary judgment in favor of the power company and the tree service.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*