**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 20, 2016**

# In the Court of Appeals of Georgia

A16A1475. GREENBERG FARROW ARCHITECTURE, INC. v.
JMLS 1422, LLC

PETERSON, Judge.

Greenberg Farrow Architecture, Inc. ("Greenberg Farrow") brought this lawsuit against JMLS 1422, LLC ("JMLS"), alleging that JMLS had violated the terms of an agreement regarding a parking deck. The trial court granted JMLS's motion for partial summary judgment on Greenberg Farrow's claims of breach of contract, conversion, and declaratory judgment. Greenberg Farrow appeals, arguing the trial court erred by (1) finding that the terms of the agreement are ambiguous; (2) concluding no material issues of fact regarding the intent of the parties to the agreement remained; (3) concluding that Greenberg Farrow waived its right to contest the meaning of the pertinent agreement provision; and (4) granting partial summary

judgment to JMLS notwithstanding that Greenberg Farrow is owed damages even under the trial court's interpretation of the agreement. Because we agree that the trial court erred both by finding the agreement in question ambiguous and by finding that Greenberg Farrow waived its rights as a matter of law, we reverse the grant of summary judgment to JMLS on Greenberg Farrow's claims for breach of contract and declaratory judgment. Because Greenberg Farrow does not challenge on appeal the trial court's grant of summary judgment to JMLS on Greenberg Farrow's conversion claim, we affirm that aspect of the court's ruling.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Ass'n of Savannah v. Chatham Cty.*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

So viewed, John Marshall Law School ("John Marshall" or "the Law School") in 1996 purchased two buildings, 1422 West Peachtree Street ("the 1422 Building") and 1430 West Peachtree Street ("the 1430 Building"), along with a parking deck located behind the buildings. *See Parking Deck, LLC v. Anvil Corp.*, 259 Ga. App. 1, 1 (576 SE2d 24) (2002). The Law School then entered into a purchase agreement

2

to sell the 1430 Building and easement rights in the parking deck property to Anvil Corporation ("Anvil"). *See id.*[1] The Reciprocal Easement Agreement ("the REA") entered into by the Law School and Anvil on October 1, 1996, gave Anvil an easement permitting the use of 120 of the deck's 254 parking spaces, "at no additional charge to Anvil" except for certain defined maintenance and security expenses. The REA also divided certain expenses and profits from the parking deck between the Law School and Anvil:

> 5.2 *Expenses and Profits of Parking Deck*. Expenses of personnel and security surveillance (the "Security Expenses") and profits of operations relating to the parking lot shall be allocated between the parties, 67% to John Marshall and 33% to Anvil. All other expenses, specifically, routine maintenance and structural repairs (the "Maintenance Expenses"), if necessary, related to the parking lot shall be allocated between the parties on a 50%/50% basis. Anvil shall reimburse John Marshall for its portion of the Maintenance and Security Expenses

---

[1] The Law School later tried to sell the 1430 building to someone else, claiming it still owned the building because the closing was not finalized and the deed was not recorded, but a jury that heard Anvil's suit against the Law School determined that Anvil was the rightful owner of the property. *See Parking Deck*, 259 Ga. App. at 1-2. The Law School and Anvil subsequently entered into an agreement regarding the building financing. *Id.* at 2. A third party later sued Anvil seeking a declaratory judgment that Anvil had no easement rights in the deck, but we upheld a ruling granting summary judgment to Anvil. *Id.* at 3-4 (2)-(3).

within 30 days of receipt of a statement from John Marshall evidencing such expenses.

The REA provided that the Law School reserved "for itself and its respective successors and assigns, the right to use the . . . Parking Deck . . . for the purposes for which such areas have been established and for any other purposes which are not inconsistent with the grant of the easements . . . ." The REA also provided that the parking garage "shall at all times be operated in a manner consistent with the operation of other garage facilities in comparable office buildings in Atlanta, Georgia."

Ownership of both the 1422 Building and the parking deck subsequently changed hands multiple times. *Parking Deck*, 259 Ga. App. at 1-2. In 2003, JMLS purchased the 1422 Building and the parking deck, including John Marshall's rights under the REA. At the time, the Law School was leasing space in the 1422 Building from another entity, and in March 2003 it entered into a lease addendum with JMLS as the new landlord. In his Rule 30(b)(6) deposition on behalf of JMLS, Michael Markovitz[2] testified that use of the parking deck was included in the Law School's

---

[2] Markovitz testified that he is president of JMLS and a member of the board of directors of the Law School.

4

rent. The Law School sold parking passes to its students and faculty, while JMLS received revenue for parking by other, transient parkers.

The ownership of the 1430 Building also changed over time. An entity named Pershing Point, LLC, purchased the 1430 Building and converted it into condominiums. Greenberg Farrow, an architectural firm, in March 2007 purchased three of the condo units, giving it an ownership interest in the building and the right to a portion of the 120 parking spaces that had been allocated to Anvil under the REA. JMLS also bought condos in the 1430 Building. A September 2011 amendment to the Law School's lease added space now owned by JMLS in the 1430 Building, explicitly made access to 195 of the spaces located in the parking deck part of the premises covered by the rental agreement, and raised the rental rate.

A dispute between the parties arose when Greenberg Farrow questioned an invoice from the 1430 Building's property manager directing Greenberg Farrow to pay real estate taxes related to the parking garage. JMLS in September 2013 informed Greenberg Farrow via e-mail that it was disabling the parking cards used by Greenberg Farrow for non-payment of expenses. JMLS said that it would reactivate the cards once Greenberg Farrow paid $16,474.48, which JMLS said was Greenberg Farrow's "pro-rata share of the past due amount." JMLS's email said Greenberg

Farrow still could use the parking deck on a cash basis. Greenberg Farrow brought this lawsuit against JMLS two days later.

The central issue in the case concerns the meaning of the phrase "profits of operations relating to the parking lot" as used in § 5.2 of the REA. Robert D'Agostino, who negotiated the REA as then-dean and CEO of John Marshall, and Bijan Kasraie, who negotiated the REA on behalf of Anvil, provided affidavits saying that, following the filing of the REA, neither Anvil nor the Law School ever accounted to the other for its own use of the parking deck.[3] But Greenberg Farrow has taken the position that the REA provision giving it a share of the "profits of operation" of the parking deck included JMLS's lease of parking spaces to the Law School. In his deposition as a Rule 30(b)(6) witness for Greenberg Farrow, company president and CEO Esmail Ghadrdan testified that his understanding was that the profits considered for purposes of the REA included the rental of all spaces except for the 120 spaces allocated for the 1430 Building.

In filing this lawsuit, Greenberg Farrow sought a temporary restraining order giving it immediate access to the parking deck without additional charge, pending

---

[3] Although these witnesses provided further testimony as to the parties' intentions in drafting the REA, we do not rely on it given our ultimate finding that the pertinent provision is unambiguous.

6

resolution by the court of the account disputes. The trial court granted the TRO largely as requested. Greenberg Farrow filed an amended complaint seeking a permanent injunction, declaratory judgment, and damages under theories of breach of contract, conversion, and interference with enjoyment of property, as well as punitive damages and attorneys' fees. JMLS counterclaimed for breach of the REA and an alleged agreement under which Greenberg Farrow was to pay for use of JMLS's trash pickup services and sought attorneys' fees, too.

JMLS filed a motion for partial summary judgment seeking dismissal of Greenberg's claims for declaratory judgment, breach of contract, and conversion. The trial court granted the motion. The trial court concluded that the phrase "profits of operations relating to the parking lot" in the REA was ambiguous, and then turned to extrinsic evidence to determine its meaning. The trial court found that the evidence was undisputed that "the drafters of the REA intended for the phrase to apply to the revenue derived from transient third party parkers, but did not intend for the owners of the two buildings to have to account to each other for their own use or to share any revenue derived from such use." The trial court also found that by acquiescing in the procedure for accounting of profits put in place at the time the REA was created, Greenberg Farrow had waived any contrary interpretation.

7

Greenberg Farrow filed this appeal and challenges the trial court's construction of the REA, as well as its conclusion that Greenberg Farrow waived its right to contest that interpretation. Greenberg Farrow also argues that JMLS owes it damages even under the trial court's interpretation of the agreement and thus the trial court erred in granting partial summary judgment to JMLS.

1. Greenberg Farrow argues that the trial court erred in finding that the terms of the REA are ambiguous. We agree.

The interpretation of a contract is a question of law, unless the contract language presents an ambiguity that cannot be resolved by the rules of construction. *Mun. Elec. Auth. v. Gold-Arrow Farms, Inc.*, 276 Ga. App. 862, 866 (1) (625 SE2d 57) (2005).

> The cardinal rule of construction is to ascertain the intent of the parties. Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties. To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred. When the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation[,] the language used must be afforded its literal meaning and plain ordinary words given their usual significance . . . . An ambiguity is defined as duplicity,

8

indistinctness, an uncertainty of meaning or expression used in a written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations. Where ambiguities exist, the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent. Parol evidence may not be considered unless the written instrument is ambiguous.

*Id.* at 866-67 (1) (citations and punctuation omitted).

The REA provided that "profits of operations relating to the parking lot" were to be divided, 67 percent to John Marshall and 33 percent to Anvil. JMLS has acquired John Marshall's rights under the REA, and Greenberg Farrow has acquired a portion of Anvil's parking rights under the REA. The parties do not dispute the definition of the "profits"; Greenberg Farrow notes the term is generally defined as "total sales revenue less all operating expenses," and JMLS says that definition is not in dispute. "Operations" is not an inherently ambiguous term and is generally defined as "performance of a practical work or of something involving the practical application of principles or processes" or "a doing or performing action; work; a deed." *Am. Nat'l Prop. & Cas. Co. v. Amerieast, Inc.*, 297 Ga. App. 443, 447 (1) (677 SE2d 663) (2009) (quoting dictionary definitions). It appears that the parties' dispute,

9

rather, is as to the scope of the operations from which profits are to be divided. Greenberg Farrow argues that the scope of those operations is all of the parking deck, minus the easement allowing the use of 120 spaces by Anvil and its successors without additional cost. JMLS argues that the term is ambiguous and that the court should rely on extrinsic evidence showing that the applicable scope is only the use of the parking deck by "transient" motorists, not including lease of spaces to the Law School.

We agree with Greenberg Farrow that the language of the REA is clear on this point. The agreement on allocation of profits applies to "operations relating to the parking lot." The only language limiting the scope of operations on which profits must be shared is the provision granting Anvil the use of 120 spaces "at no additional charge" except for its defined percentage contribution to maintenance and security expenses. There is no other language limiting the scope of operations on which profits are to be allocated. The REA is thus clear that the term "profits of operation relating to the parking lot" encompasses the profits on all spaces in the deck, minus the use of the 120 spaces by Anvil and its successors. Given that the terms of the contract are plain in this regard, the trial court erred by considering the parol evidence submitted by JMLS. *See Mun. Elec. Auth.*, 276 Ga. App. at 867-69).

In support of its argument that the REA is ambiguous, JMLS points out that nothing in the agreement requires the owner of the 1422 Building "to charge itself" for its use of the deck. It is true that in the REA the owner of the 1422 Building reserved for itself the right to use the parking deck. But to the extent that JMLS is charging someone else – whether Law School students and staff, the Law School itself, or assorted members of the public – for use of the deck, the REA does not exclude that revenue from that on which "profits of the operations" are calculated.[4] That this may be a bad bargain for JMLS does not render the REA ambiguous.

JMLS offers nothing further in support of its argument that the REA is ambiguous, except for pointing to extrinsic evidence and "the parties' differing interpretations of the contractual provision." JMLS notes that Michael Kornheiser, an attorney admitted to practice in Georgia who provided a deposition as a corporate representative for Greenberg Farrow, testified that he was "happy" to say he had not drafted the REA and agreed that "it clearly did not spell out everything the way it should have." But, as explained above, we do not consider such extrinsic evidence absent an ambiguity on the face of the document. And the fact that two parties

---

[4] JMLS has emphasized in this appeal that it and the Law School are separate entities.

disagree on a contract's meaning does not by itself render the contract ambiguous; otherwise, courts charged with presiding over a contract dispute would never be limited to the language of the agreement itself in construing it but would always be free to turn to extrinsic evidence.

2. As an alternative basis for granting partial summary judgment to JMLS, the trial court held as a matter of law that Greenberg Farrow had waived its right to challenge JMLS's interpretation of the "profits of operation relating the parking lot" provision of the REA. Greenberg Farrow argues on appeal that this was error because the question of waiver presents a dispute of material fact. We agree that JMLS has not established as a matter of law that Greenberg Farrow waived its rights.

"It is well recognized that a party to a contract may waive contractual provisions for his benefit." *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 217 (4) (a) (707 SE2d 508) (2011). A waiver may be shown through a party's conduct. *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 321 Ga. App. 451, 453-54 (1) (739 SE2d 493) (2013).

> But the law will not infer the waiver of an important contract right
> unless the waiver is *clear and unmistakable*. And because waiver is not
> favored under the law, the evidence relied upon to prove a waiver must
> be so clearly indicative of an intent to relinquish a then known particular

12

right or benefit as to exclude any other reasonable explanation. Indeed, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist. The burden of proof lies with the party asserting waiver[.]

*Id.* at 454 (1) (footnotes and punctuation omitted; emphasis in original). Waiver may be a question of law when the facts and circumstances essential to the question are clearly established. *Id.* at 454-56 (1) (evidence clearly established a lack of intent or understanding that contractor waived pay-if-paid provision). But the existence of a waiver generally is a jury question. *Id*. at 454 (1). "If there is conflicting evidence over whether a waiver occurred, the issue is for a jury to resolve." *AAF-McQuay, Inc.*, 308 Ga. App. at 217 (4) (a). In particular, "[a] party's protracted silence, or unreasonable delay in making protest, can raise a fact issue as to whether she has waived a contractual right." *Id.* at 217-18 (4) (a) (trial court erred by rejecting waiver argument as a matter of law)

Here, the trial court said that Greenberg Farrow's acceptance of an arrangement under which neither Greenberg Farrow nor JMLS accounted to the other for their own use of the parking deck and neither shared any revenue derived from such use was evidence that clearly established Greenberg Farrow's waiver of the position that it takes now. But the record contains conflicting evidence over whether a waiver

13

occurred. Although the trial court premised its finding of waiver on the notion that Greenberg Farrow had accepted the arrangement as contemplated by JMLS from the time that it purchased an interest in the 1430 Building until initiating this lawsuit, there is evidence that Greenberg Farrow was not aware that JMLS was treating the REA in this fashion until several years after Greenberg Farrow purchased an interest in the building. Greenberg Farrow purchased its condo units in the 1430 Building in March 2007. Ghadrdan, Greenberg Farrow's president and CEO, testified that when Greenberg Farrow first purchased the condo units, he understood that revenue from the rental of parking spaces to John Marshall law students was being shared under the REA. Ghadrdan testified that it was only when he was presented with an invoice for taxes on the parking deck that he realized that JMLS was not sharing revenue consistent with his understanding of the deal.[5] Once he came to this realization, Ghadrdan said, Greenberg Farrow began to contest JMLS's approach, setting off a series of events that culminated in this lawsuit.

On appeal, JMLS argues that Greenberg Farrow should have known that the revenue shared with Greenberg Farrow and the other owners of the 1430 Building

---

[5] Ghadrdan testified that he could not remember exactly when he came to this realization but indicated, consistent with a tax invoice shown to him during his deposition, that it happened in 2010 or later.

14

was "minimal" and consistent with sharing of revenue from only "third-party transient parking," and that Greenberg Farrow should have exercised more diligence and examined available records. But a mere lack of diligence is not the same thing as a waiver. "[W]here the only evidence of an intention to waive is what a party does or forbears to do, there is no waiver unless his acts or omissions to act are so manifestly consistent with an intent to relinquish a then-known particular right or benefit that no other reasonable explanation of the conduct is possible." *Eckerd Corp. v. Alterman Props., Ltd.*, 264 Ga. App. 72, 75 (1) (589 SE2d 660) (2003) (questions of whether either party waived rights in dispute over lease terms are for a jury to decide). One cannot intentionally waive a right one does not know exists.

JMLS also supports its argument of waiver by pointing to evidence that Greenberg Farrow and other 1430 Building owners leased out spaces without providing any accounting to JMLS, suggesting this is evidence that Greenberg Farrow had accepted an arrangement in which neither party needed to account to the other for use of their "own" parking spaces. But Ghadrdan testified that he understood that revenue from the 51 spaces allocated to Greenberg Farrow did not need to be shared with JMLS under the terms of the REA, offering his explanation of why the REA imposed obligations on JMLS that it did not impose on Greenberg Farrow.

15

Therefore, regardless of whether Greenberg Farrow's actions were proper under the REA, its failure to account to JMLS for its own usage of the deck does not amount to evidence that it waived its right to challenge JMLS's failure to share revenue from the sale of parking spaces to all but "transient" parkers. JMLS has not established as a matter of law that Greenberg Farrow waived that right. We therefore reverse the trial court's grant of summary judgment to JMLS on Greenberg Farrow's breach of contract claim.[6]

3. JMLS argues that because Greenberg Farrow has not presented any argument on appeal challenging specifically the trial court's determination that Greenberg Farrow's claims for declaratory judgment and conversion should be dismissed, the ruling of the trial court should be affirmed as to those claims. The trial court's ruling granting summary judgment on the declaratory judgment claim appears to be based on the conclusion that it is moot given the resolution of the breach of contract claim. Given our conclusion that summary judgment on the breach of contract claim was in error, we also reverse as to the declaratory judgment action.

---

[6] Given this conclusion, we need not consider Greenberg Farrow's argument that, even if the trial court's interpretation of the REA is correct, Greenberg Farrow still is owed damages.

16

As to the conversion claim, the trial court also granted summary judgment on the basis of its construction of the REA. However, the trial court offered as an alternative basis for summary judgment the reason that "[c]onversion is not a viable claim where there is nothing more than an alleged failure by the defendant to pay money owed to the plaintiff." Greenberg Farrow does not challenge this proposition on appeal, and thus we affirm the trial court's grant of summary judgment to JMLS on this claim.

*Judgment affirmed in part and reversed in part. Phipps, P. J., and Dillard, J., concur.*